IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs April 24, 2014

IN RE KIARA C.

Appeal from the Chancery Court for Blount County
No. 12038     Telford E. Forgety, Jr., Chancellor

No. E2013-02066-COA-R3-PT - Filed June 30, 2014

This is a termination of parental rights case, focusing on Kiara C., the minor child ("Child") of Mark C. ("Father") and Pamela B. ("Mother"). On April 9, 2012, Mother and Mother's husband, Richard B. ("Stepfather"), filed a petition for termination of Father's parental rights and adoption of the Child by Stepfather. Following a bench trial, the trial court granted the petition for termination upon its finding, by clear and convincing evidence, that Father had abandoned the Child by willfully failing to visit her and willfully failing to provide financial support in the four months preceding the filing of the petition. The court further found, by clear and convincing evidence, that termination of Father's parental rights was in the Child's best interest. Father has appealed. We affirm.

Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court
Affirmed; Case Remanded

THOMAS R. FRIERSON, II, J., delivered the opinion of the Court, in which D. MICHAEL SWINEY and JOHN W. MCCLARTY, JJ., joined.

Susan H. Rushing, Alcoa, Tennessee, for the appellant, Mark C.

James R. LaFevor, Knoxville, Tennessee, for the appellees, Pamela B. and Richard B.

Robert L. Huddleston, Maryville, Tennessee, Guardian ad litem.

## OPINION

### I. Factual and Procedural Background

Mother and Father were married on November 9, 2001. Both were serving in the United States Army and living in El Paso, Texas, at the time. The Child was born in May 2002. In July 2002, the family moved to Pekin, Illinois, to reside with Mother's sister and brother-in-law. That address was listed on Mother's and Father's discharge paperwork. Subsequently, the family lived with Mother's parents in Marquette Heights, Illinois, and then moved to an apartment in Pekin, Illinois.

Mother and Father separated in August 2003, in Pekin, Illinois. Mother testified at trial that prior to her filing for divorce, an Order of Protection was issued against Father by an Illinois court, although that order was not included in the appellate record and its exact date of entry is unclear. It is undisputed that in its Order of Protection, the Illinois court granted Father supervised visitation with the Child. Father exercised his visitation rights with the Child once at a Young Women's Christian Association ("YWCA") facility and a second time under the supervision of Mother's family members. That second and final visit by Father took place on November 25, 2003.

On January 26, 2004, the Illinois court granted a default Judgment of Dissolution of Marriage to Mother. Pursuant to the divorce decree, which was entered into evidence at trial, Father was denied visitation until further order of the court. The court specifically found that "unrestricted visitation" with Father "would seriously endanger the physical, mental, moral or emotional health" of the Child due to concerns at the time regarding Father's mental health. The Illinois court further found that Father was "gainfully employed by the Illinois Army National Guard," but the court reserved the issue of child support due to Father's "pending military discharge." Pursuant to the divorce decree, Father was required to "assume full responsibility for all future necessary medical, dental, orthodont[ic], prescription drug and optical expenses incurred by or on behalf of" the Child.

At trial in the instant action, Mother testified that Father moved from Illinois in December 2003, approximately one month before entry of the divorce decree, and that he left no forwarding address. After December 2003, the only communication Mother received from Father prior to the filing of the instant action was an Easter card containing some loose coins for the Child in 2004. Mother did not attempt to communicate with Father until March 2012, when she asked him via Facebook message if he would be willing to surrender his parental rights to the Child. Father replied once negatively and did not attempt at that time to arrange visitation with the Child. When Mother located Father in 2012, he was living in Malone, New York.

Mother and the Child remained domiciled in Illinois until October 2007. According to Stepfather's deposition testimony, admitted as an exhibit at trial, at some point in 2004, Mother served in the Illinois National Guard and met Stepfather when both of them were serving in Kuwait. During Mother's brief deployment out of the United States, the Child resided with Mother's aunt in Illinois. Mother married Stepfather on August 12, 2006, in Cairo, Illinois. From that date through the date of trial in the instant action, the Child resided with Mother and Stepfather. In October 2007, the family relocated to North Carolina upon military orders received by Stepfather, then a staff sergeant in the United States Army. The family relocated again in July 2011 to Seymour, Tennessee, when Stepfather received further orders from the Army with duty at the University of Tennessee. Mother and Stepfather have two additional children together and, at the time of trial, were expecting another child.

On April 9, 2012, Mother and Stepfather filed a petition with the Blount County Chancery Court to terminate Father's parental rights and allow Stepfather to adopt the Child. They alleged that Father had abandoned the Child by willfully failing to visit and willfully failing to support her for four months preceding the filing of the petition. Additionally, Mother and Stepfather alleged that it was in the best interest of the Child that Father's rights be terminated. Following the filing of this petition, Stepfather was commissioned as a second lieutenant in the United States Army and received orders to perform temporary duties at Fort Huachuca, Arizona, en route to Italy for a total commitment of six years. Mother, Stepfather, the Child, and their other children relocated to Arizona in July 2012.

Father, acting without benefit of counsel, filed an answer to the instant petition on May 16, 2012. On November 8, 2012, Mother and Stepfather filed a "Motion to Strike Pleadings and/or Deny Defense Based Upon Inability to Pay Support," alleging that Father had failed to adequately respond to discovery attempts and was therefore hampering their ability to present evidence as to whether he had the financial ability to pay child support. The trial court treated the motion as a motion to compel discovery and granted it on January 16, 2013. On March 6, 2013, the trial court appointed Attorney Robert Huddleston as guardian *ad litem* ("GAL") for the Child. On March 25, 2013, Father filed a request for an appointed attorney, attaching an affidavit of indigency. On April 3, 2013, the trial court found Father to be indigent and appointed counsel to represent him.

Pursuant to the trial court's order to compel discovery, Father was subpoenaed to a deposition scheduled for May 28, 2013. He failed to appear at the deposition, and although Father's counsel appeared on his behalf, no reason was given for Father's absence. Mother and Stepfather subsequently filed a "Motion for Sanctions for Failure to Participate in Discovery" on May 31, 2013. The trial court reserved ruling on that motion pending Father's

upcoming scheduled appearance at the trial. Father subsequently failed to appear at trial, but he was represented by counsel.

Following a trial conducted on August 8, 2013, the trial court found by clear and convincing evidence that Father had abandoned the Child by willfully failing to visit and willfully failing to support her during the four months preceding the filing of the petition for termination. The court further found by clear and convincing evidence that it was in the best interest of the Child to terminate Father's parental rights. On October 3, 2013, the trial court entered a final judgment and incorporated its findings as a Memorandum Opinion. Father timely appealed.

## II. Issues Presented

On appeal, Father presents two issues, which we have restated as follows:

1. Whether the trial court erred by finding that there was clear and convincing evidence of abandonment by willful failure to visit for the four months preceding the filing of the petition, pursuant to Tennessee Code Annotated § 36-1-113(g)(1).

2. Whether the trial court erred by finding that there was clear and convincing evidence of abandonment by willful failure to pay child support for the four months preceding the filing of the petition, pursuant to Tennessee Code Annotated § 36-1-113(g)(1).

In addition, Mother and Stepfather raise the following issue essential to our review:

3. Whether the trial court erred by finding that there was clear and convincing evidence that it was in the best interest of the Child to terminate Father's parental rights and allow Mother and Stepfather to proceed with the adoption, pursuant to Tennessee Code Annotated § 36-1-113(i).

## III. Standard of Review

In a termination of parental rights case, this Court has a duty to determine "whether the trial court's findings, made under a clear and convincing standard, are supported by a preponderance of the evidence." *In re F.R.R., III*, 193 S.W.3d 528, 530 (Tenn. 2006). The trial court's findings of fact are reviewed *de novo* upon the record, accompanied by a presumption of correctness unless the evidence preponderates against those findings. *Id.*; Tenn. R. App. P. 13(d). Questions of law, however, are reviewed *de novo* with no

presumption of correctness. *In re Bernard T.*, 319 S.W.3d 586, 597 (Tenn. 2010).[1] The trial court's determinations regarding witness credibility are entitled to great weight on appeal and shall not be disturbed absent clear and convincing evidence to the contrary. *See Jones v. Garrett*, 92 S.W.3d 835, 838 (Tenn. 2002).

"Parents have a fundamental constitutional interest in the care and custody of their children under both the United States and Tennessee constitutions." *Keisling v. Keisling*, 92 S.W.3d 374, 378 (Tenn. 2002). It is well established, however, that "this right is not absolute and parental rights may be terminated if there is clear and convincing evidence justifying such termination under the applicable statute." *In re Drinnon*, 776 S.W.2d 96, 97 (Tenn. Ct. App. 1988) (citing *Santosky v. Kramer*, 455 U.S. 745, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982)). As our Supreme Court has instructed:

> In light of the constitutional dimension of the rights at stake in a termination proceeding under Tenn. Code Ann. § 36–1–113, the persons seeking to terminate these rights must prove all the elements of their case by clear and convincing evidence. Tenn. Code Ann. § 36–1–113(c); *In re Adoption of A.M.H.*, 215 S.W.3d at 808–09; *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002). The purpose of this heightened burden of proof is to minimize the possibility of erroneous decisions that result in an unwarranted termination of or interference with these rights. *In re Tiffany B.*, 228 S.W.3d 148, 155 (Tenn. Ct. App. 2007); *In re M.A.R.*, 183 S.W.3d 652, 660 (Tenn. Ct. App. 2005). Clear and convincing evidence enables the fact-finder to form a firm belief or conviction regarding the truth of the facts, *In re Audrey S.*, 182 S.W.3d 838, 861 (Tenn. Ct. App. 2005), and eliminates any serious or substantial doubt about the correctness of these factual findings. *In re Valentine*, 79 S.W.3d at 546; *State, Dep't of Children's Servs. v. Mims* (*In re N.B.*), 285 S.W.3d 435, 447 (Tenn. Ct. App. 2008).

*In re Bernard T.,* 319 S.W.3d at 596.

---

[1] As a threshold matter, we note that the trial court properly exercised jurisdiction in this action because Mother, Stepfather, and the Child lived in Seymour, Tennessee, for at least six months prior to the filing of the petition, *see* Tenn. Code Ann. § 36-6-216(a)(1) (2010), and neither "the child, the child's parents, [or] any person acting as a parent" had resided in Illinois since 2007, *see* Tenn. Code Ann. § 36-6-218(2) (2010) (codifying in part Tennessee's adoption of the Uniform Child Custody Jurisdiction and Enforcement Act).

## IV. Statutory Abandonment

The trial court terminated Father's parental rights on the ground that he abandoned the Child. Tennessee Code Annotated § 36-1-113(g)(1) (Supp. 2012) provides, as relevant to this action, as follows:

> (g) Initiation of termination of parental or guardianship rights may be based upon any of the grounds listed in this subsection (g). The following grounds are cumulative and non-exclusive, so that listing conditions, acts or omissions in one ground does not prevent them from coming within another ground:
>
>   (1) Abandonment by the parent or guardian, as defined in § 36-1-102, has occurred; . . .

Tennessee Code Annotated § 36-1-102(1)(A)(i) (2010) defines abandonment, in relevant part, as:

> For a period of four (4) consecutive months immediately preceding the filing of a proceeding or pleading to terminate the parental rights of the parent(s) or guardian(s) of the child who is the subject of the petition for termination of parental rights or adoption, that the parent(s) or guardian(s) either have willfully failed to visit or have willfully failed to support or have willfully failed to make reasonable payments toward the support of the child; . . .

Pursuant to the statute, the court must find that a parent's failure to visit or support was willful. *In re Adoption of A.M.H.*, 215 S.W.3d 793, 810 (Tenn. 2007). As this Court has previously explained:

> The concept of "willfulness" is at the core of the statutory definition of abandonment. A parent cannot be found to have abandoned a child under Tenn. Code Ann. § 36-1-102(1)(A)(i) unless the parent has either "willfully" failed to visit or "willfully" failed to support the child for a period of four consecutive months.

*In re Audrey S.*, 182 S.W.3d 838, 863 (Tenn. Ct. App. 2005).

Failure to visit or support a child is "willful" when a person is "aware of his or her duty to visit or support, has the capacity to do so, makes no attempt to do so, and has no justifiable excuse for not doing so." *Id.* at 864. Further, failure to visit or to support is not excused by another person's conduct "unless the conduct actually prevents the person with

the obligation from performing his or her duty . . . or amounts to a significant restraint of or interference with the parent's efforts to support or develop a relationship with the child." *Id.*

This Court further explained:

The willfulness of particular conduct depends upon the actor's intent. Intent is seldom capable of direct proof, and triers-of-fact lack the ability to peer into a person's mind to assess intentions or motivations. Accordingly, triers-of-fact must infer intent from the circumstantial evidence, including a person's actions or conduct.

*Id.* (citations omitted).

Further, as Tennessee Code Annotated § 36-1-102(1)(G) expressly provides: "Specifically, it shall not be required that a parent be shown to have evinced a settled purpose to forego all parental rights and responsibilities in order for a determination of abandonment to be made."

### A. Willful Failure to Visit

In its Memorandum Opinion, incorporated into the final judgment, the trial court specified the following pertinent findings of fact regarding the ground of abandonment by willful failure to visit the Child:

It appears that [Father] left Pekin, Illinois, which was where the parties lived at the time they were divorced and he left no forwarding address with [Mother], and never contacted her thereafter asking to visit with the child or to provide any support. The Court finds by clear, cogent, and convincing evidence that [Father] has abandoned [the Child] by failure to visit and failure to provide any support, not just for four months but for ten years.

. . . .

The evidence shows that for a long period of time, some three years it appears, after the divorce [Mother], her permanent home was still in Pekin, Illinois, so that - - and where, by the way, her parents live close by. . . . There was where [Mother] continued to live for three years at least.

And the Court observes that [Father] made no attempt whatsoever to come back to Illinois to try to see this child, and he could have done so. All he had to do was file some sort of petition with the Illinois Divorce Court and say, look, I want my visitation rights. That's all he had to do. He never did. He never has within ten years.

The trial court found by clear and convincing evidence that Father had willfully failed to visit the Child, not only during the statutory four-month period preceding the filing of the petition for termination of parental rights, but for ten years preceding the petition's filing. We agree with the trial court.

The four-month statutorily determinative period in this action began on December 9, 2011, and extended through the filing of the petition for termination on April 9, 2012. Father last visited the Child on November 25, 2003. It is undisputed that, apart from one greeting card sent with loose change on Easter 2004, Father made no other attempt to contact Mother or visit the Child after November 2003, inclusive of the determinative period. Even following Mother and Stepfather's filing of the petition, Father made no attempt to visit the Child through the date of trial. Preceding Mother's and Father's January 2004 divorce, the Illinois court issued an order of protection in which it granted supervised visitation rights to Father. He exercised these rights exactly twice, the second and final time occurring on November 25, 2003. Mother testified at trial and the court found that Father left Illinois in December 2003 without providing Mother notice of his whereabouts.

Father contends that his failure to visit the Child was not willful because the Illinois court denied visitation to him in the January 2004 divorce decree. In fact, Father was denied visitation only "until further orders of this Court." As the trial court noted, Father could have petitioned the Illinois court at any time during the past ten years to modify the January 2004 order, but he did not. This Court has often held that when a parent's visitation has been suspended by the trial court and the parent has the ability to demonstrate a change in situation or behavior that would warrant reinstating visitation but fails to do so, that parent can be found to have willfully failed to visit. *See, e.g., In re Elijah B.*, E2010-00387-COA-R3-PT, 2010 WL 5549229 at *8 (Tenn. Ct. App. Dec. 29, 2010); *Tenn. Dep't of Children's Servs. v. J.A.H.*, E2005-00860-COA-R3-PT, 2005 WL 3543419 at *6 (Tenn. Ct. App. Dec. 28, 2005) (holding that the father's decision not to submit to testing that was a precondition to further visitation constituted a "willful decision to discontinue visiting his son").

Additionally, Father contends that his failure to visit was not willful because there existed at the time of the divorce an order of protection prohibiting Father from contacting Mother and the Child. Unrefuted testimony demonstrated, however, that this order of

protection expired on or about March 15, 2004. The order of protection did not actually prevent Father from visiting the Child after its March 2004 expiration and certainly not during the applicable four-month period preceding the filing of the petition to terminate his parental rights. Father asserts on appeal that Mother and Stepfather failed to prove that he knew if or when the order expired, yet he also asserts that his knowledge of the order prevented him from visiting the Child. As previously noted, the order of protection was not included in the appellate record, and no proof of its service on Father was presented. If, however, as Father asserts, he knew that the order of protection had been entered against him, it follows that he at least knew which court had entered it and certainly could have accessed that court record to discover the expiration date. Father's failure to do so was voluntary, and his argument is unavailing in this regard.

To support his position, Father relies in part on *In re: Drako J.M.*, in which this Court concluded that the mother had not willfully failed to visit her children while they were in the paternal grandparents' custody because during the four months preceding the filing of the petition, the father had erroneously told the mother that there was a restraining order prohibiting her from seeing the children. *See In re: Drako*, No. M2012-01404-COA-R3-PT, 2012 WL 6634335 at *8 (Tenn. Ct. App. Dec. 18, 2012). This Court reached that determination in light of the surrounding circumstances, namely that the paternal grandparents had continuously thwarted the mother's attempts to see her children. *Id. In re: Drako* is factually distinguishable from the instant action, and Father's reliance is misplaced. Upon a thorough review of the record, we find no indication that Mother made any efforts to restrict or eliminate Father's visitation following the expiration of the order of protection in March 2004 and through the filing of the instant action, inclusive of the four-month determinative period.

Finally, Father argues that Mother and Stepfather failed to prove that anyone advised him that "obeying" the Illinois court's order could constitute willful abandonment under Tennessee law. As previously noted, Father's failure to visit was not a result of obedience to the Illinois court's directive after March 2004 once the order of protection had expired. Moreover, it is irrelevant whether Father knew the potential consequences of his failure to visit the Child. As our Supreme Court has elucidated:

> We decline to hold that a parent must be aware of the consequences of his failure to visit for such a failure to be willful. The plain language of the statute requires that the failure to visit be "willful," not that the parent be fully apprised of every consequence the failure to visit might produce. Persons are presumed to know the law, *see Wallace v. Nat'l Bank of Commerce*, 938 S.W.2d 684, 686 (Tenn. 1996); *Bd. of Educ. v.*

*Shelby County*, 207 Tenn. 330, 339 S.W.2d 569, 584 (1960), and parents should know that they have a responsibility to visit their children.

*In the Matter of M.L.P.*, 281 S.W.3d 387, 392 (Tenn. 2009). We note also that the trial court underscored its finding of abandonment by observing that Father failed to take whatever actions would have been necessary to allow him to appear at trial for the termination proceeding. We conclude that the evidence does not preponderate against the trial court's determination that Father willfully failed to visit the Child for four consecutive months preceding the filing of the petition for termination of his parental rights. The trial court did not err in terminating Father's parental rights based upon this ground.

### B. Willful Failure to Support

In its Memorandum Opinion, incorporated into the final judgment, the trial court also included the following specific findings of fact regarding Father's willful failure to support the Child:

> The divorce decree did reserve child support, although it also found in Paragraph 10 that [Father] was at that time employed by the Illinois National Guard and was earning approximately eleven hundred dollars per month and is well able to furnish suitable and sufficient support for [Mother] and [the Child]. Nevertheless, the Court reserved support at that time.
>
> It appears that [Father] left Pekin, Illinois, which was where the parties lived at the time they were divorced and he left no forwarding address with [Mother], and never contacted her thereafter asking to visit with the child or to provide any support. The Court finds by clear, cogent, and convincing evidence that [Father] has abandoned [the Child] by failure to visit and failure to provide any support, not just for four months but for ten years.
>
> . . . .
>
> The Court has already said and reiterates that any parent knows that he or she owes a duty of support to his or her children. You don't need a court to tell them that. Now, they might need a Court to calculate the amount for them, but any

> parent knows that he or she owes a duty of support to the child. And by the way, if [Father] didn't know anything else, if he did not know anything else from the Illinois divorce decree, he surely knew that he was ordered to provide for the child's medical needs, for the court order said so, and he's never provided a nickel, not a dime, not a penny.

The court found by clear and convincing evidence that Father had willfully failed to support the Child during the applicable four-month period preceding the filing of the petition for the termination of parental rights. We agree.

The Illinois court's January 2004 divorce decree, *inter alia*, ordered Father to assume full responsibility for all future necessary medical, dental, orthodontic, prescription drug, and optical expenses incurred by or on behalf of the Child. The divorce court reserved the issue of support "due to [Father's] pending military discharge." It is undisputed that through the date of trial and inclusive of the four-month determinative period, Father never attempted to pay for any medical, dental, orthodontic, prescription drug, or optical expenses for the Child, nor had he attempted to provide any other form of support for the Child.

Father posits that his failure to provide support during the determinative period was not willful because he did not know that he had a duty to support. He relies on the definition of "willful" provided by *In re Audrey S.*, which states that "failure to visit or support a child is 'willful' when a person is aware of his or her duty to visit or support, has the capacity to do so, makes no attempt to do so, and has no justifiable excuse for not doing so." 182 S.W.3d at 864. Father also posits that his failure to pay support was not willful because Mother did not provide him with any relevant invoices for medical expenses. Lastly, Father asserts that Mother and Stepfather failed to prove that he had the financial ability to pay support during the determinative period.

Father first argues that because Mother had waived Father's duty to pay support, Father could not know about a duty he did not have. This argument is grounded in a misreading of the divorce decree, in which the Illinois court *reserved* rather than waived the issue of child support. Mother testified at trial that she did not waive Father's duty to pay child support. Moreover, whether Father had ever been ordered by a court to pay child support or advised of his duty to do so is irrelevant. As the trial court noted, parents are presumed to know that they have a duty to support their children. *See* Tenn. Code Ann. § 36-1-102(1)(H) ("Every parent who is eighteen (18) years of age or older is presumed to have knowledge of a parent's legal obligation to support such parent's child or children."); *see also Kirkpatrick v. O'Neal*, 197 S.W.3d 674, 680 (Tenn. 2006) ("[A] parent is liable for the

support of his or her child throughout minority, with or without the existence of a court order . . . .").

To support his position, Father further relies on *In re W.B., IV*, in which this Court found that the "[m]other's knowledge of a duty or expectation that she provide support and visit [was] a factor in determining willfulness." *See* No. M2004-00999-COA-R3-PT, 2005 WL 1021618 at *11 (Tenn. Ct. App. Apr. 29, 2005). In *In re W.B.*, the mother had signed an agreement with the representative of a charitable organization after the representative had been assisting her and her children for some time. *Id.* at *3. The agreement, signed so that the representative could obtain medical care for the children if necessary, stated that the mother submitted to the representative's assumption of temporary custody of the children while the mother attended a rehabilitation program. *Id.* Eventually that representative transferred custody to another family without notice to the mother and refused to reveal the identities of this new family. *Id.* at *3-4. This Court then determined that the evidence of abandonment was not clear and convincing because the mother could not have known that she was expected to visit or pay support to a family caring for her children without her knowledge and contrary to the agreement she had previously signed. *Id.* at *12.

Father's reliance on *In re W.B.* is misplaced, as it is factually distinguishable from the case at bar. Father knew that Mother had custody of the Child pursuant to the divorce decree. Although Father may not have known that the Child was living in Tennessee, unrefuted testimony demonstrated that even after Mother and the Child moved away from Illinois, Mother's family continuously resided in Illinois at addresses known to Father prior to the divorce. Father could have attempted to locate and support the Child by contacting those family members. As the trial court noted, Father also could have made efforts through the Illinois court over the years to locate and support the Child, a path suggested by this Court in *In re W.B. See Id.* at *11.

As to the Child's health expenses, Father acknowledges that the Illinois court's divorce decree ordered him to pay all of the Child's future necessary medical, dental, orthodontic, prescription drug, and optical expenses. He argues, however, that his failure to pay such expenses was not willful because Mother never provided him with relevant invoices. Mother acknowledges that she did not provide Father with any invoices, stating that she did not know Father's whereabouts. Insomuch as Father is presumed to have knowledge of the Child's need for financial support, we determine that he also should have known that the Child, like all children, would incur some health expenses over the course of ten years. Father has presented no evidence to dispute Mother's allegation that he has made no attempt over the past ten years, including the four-month determinative period, to contribute to any of the Child's health expenses. The evidence supports the trial court's finding that Father willfully failed to contribute to the Child's health expenses.

Finally, Father asserts that Mother and Stepfather failed to prove that he had the ability to pay child support during the four-month determinative period. *See In re R.L.F.*, 278 S.W.3d 305, 320 (Tenn. Ct. App. 2008) ("'A parent who fails to support a child because he or she is financially unable to do so is not willfully failing to support the child.'") (quoting *In re M.J.M., Jr.*, No. M2004-02377-COA-R3-PT, 2005 WL 873302 at *8 n.17 (Tenn. Ct. App. Apr. 14, 2005)). As the trial court indicated, the Illinois court found in its 2004 divorce decree that Father was employed at that time with the National Guard and earned approximately $1,100 per month. The Illinois court, noting that Father was soon to be discharged from the National Guard, reserved the issue of child support, presumably so that an amount could be set based upon Father's post-service income. As to the determinative period of December 9, 2011, through April 9, 2012, Father failed to submit any financial information in response to Mother's and Stepfather's repeated requests for discovery. Inasmuch as Father failed to appear at trial, he, of course, provided no testimony as to his income.

The trial court was presented, however, with information regarding Father's income during the relevant period through Father's affidavit of indigency, filed with his request for an appointed attorney on March 25, 2013. At that time, slightly less than one year following the end of the four-month determinative period, Father indicated that he was collecting unemployment benefits in the amount of $73.40 weekly. He acknowledged receiving no governmental assistance for any type of disability. He owned a home in Malone, New York, with an approximate value of $37,000.00, on which he owed a debt in the amount of $35,226.27. He reported that he last filed an income tax return in 2011 and that it reflected a net income of $6,419.00. He also owned a vehicle valued at $1,100.00 on which he owed no debt, and he reported access to a bank account with a balance of $236.46. Father listed as "dependents" the Child at issue and two younger children, aged four and six years old, respectively. According to the date of birth listed by Father, he turned thirty-two years old in January 2012.

Relative to the determinative period, Father's affidavit provided the trial court with the information that he was thirty-two years old; had not been declared disabled; and had earned a net income in 2011 as a whole, three weeks of which were in the determinative period, of $6,419.00. In addition, the fact that Father was collecting unemployment one year after the determinative period ended indicated that he was either employed during the preceding year or had secured long-term unemployment benefits. *See generally* 26 U.S.C.A. § 3304(a) (Supp. 2010) ("The Secretary of Labor shall approve any State law submitted to him . . . which he finds provides that . . . (7) an individual who has received [unemployment] compensation during his benefit year is required to have had work since the beginning of such year in order to qualify for compensation in his next benefit year."). Father also listed assets that would indicate he had established a home in New York and that he was claiming

two younger children as his dependents in addition to claiming the Child as a dependent. Upon Father's filing of his affidavit, the trial court entered an order on April 3, 2012, finding Father to be indigent and granting his request for an appointed attorney. This finding did not preclude the trial court's subsequent finding, however, that Father had the ability to pay some support on behalf of this Child. Father failed to pay even the most nominal of support during the statutory four-month period. *See, e.g., State, Dep't of Children's Servs. v. T.M.B.K.*, 197 S.W.3d 282, 293 (Tenn. Ct. App. 2006) (affirming the trial court's termination of the mother's parental rights on the ground of abandonment through failure to support when the mother had the ability to pay an amount of $15.00 monthly, assessed to be reasonable in consideration of her income, and failed to do so during the determinative period).

We conclude that the evidence does not preponderate against the trial court's determination by clear and convincing evidence that Father abandoned the Child by willfully failing to support her during the four months preceding the filing of the termination petition. The trial court did not err in terminating the Father's parental rights based upon this ground.

## V. Best Interest of Child

When a parent has been found to be unfit by establishment of a ground for termination, as here, the interests of parent and child diverge, and the focus shifts to what is in the child's best interest. *In re Audrey S.*, 182 S.W.3d at 877. Tennessee Code Annotated § 36-1-113(i) (2010) provides a list of factors the trial court is to consider when determining if termination of parental rights is in the child's best interest. This list is not exhaustive, and the statute does not require the court to find the existence of every factor before concluding that termination is in a child's best interest. *In re Audrey S.*, 182 S.W.3d at 878 ("The relevancy and weight to be given each factor depends on the unique facts of each case."). Further, the best interest of a child must be determined from the child's perspective and not the parent's. *White v. Moody*, 171 S.W.3d 187, 194 (Tenn. Ct. App. 2004).

Tennessee Code Annotated § 36-1-113(i) lists the following factors for consideration:

> (1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;
>
> (2) Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;

-14-

(3) Whether the parent or guardian has maintained regular visitation or other contact with the child;

(4) Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;

(5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;

(6) Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;

(7) Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol or controlled substances[2] as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;

(8) Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or

(9) Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101.

In determining that termination of Father's parental rights was in the best interest of the Child, the trial court expressly cited the factors enumerated in Tennessee Code Annotated § 36-1-113(i) and stated in its Memorandum Opinion the following in pertinent part:

_____

[2]Effective July 2012, after the filing of the petition in the instant case, The Tennessee General Assembly amended Tennessee Code Annotated § 36-1-113(i)(7) to substitute "alcohol, controlled substances or controlled substance analogues" in place of "alcohol and controlled substances." *See* 2012 Pub. Acts ch. 848, § 8.

And with respect to the matter of the child's best interest, there is likewise an abundance, a super abundance of evidence here that establishes to the standard of clear, cogent, and convincing that it is in the child's best interest to be adopted by [Stepfather], who is the mother's current husband. The evidence is that he has been, in truth, the only father figure the child has ever had, that he has supported her emotionally, financially in all aspects of her life. He's been her basketball coach or basketball and softball coach since the time of August 2006, which is when [Mother and Stepfather] married. Some seven years now he has been the child's father. To the extent the child had a father, he's been it.

And the evidence further establishes that since [Mother and Stepfather] married, they've had two other children and that [Mother] is expecting another child, by the way, which is not born yet, but nevertheless, the other two siblings that [the Child] has, she has grown up with them in the same household, with the same parents. They are her siblings. She loves them. Even, according to [Mother], acts as a parent figure at times.

The evidence is that [Mother and Stepfather] have an established home. They're an established couple, an established family. They have the ability to provide support for [the Child]. All indications are that it's a very loving home, a good home for children. The evidence is that [Stepfather] is now a commissioned officer in the United States Army, an Army Ranger, quite able to - - and willing and wants to be this child's father.

The trial court therefore concluded by clear and convincing evidence that it was in the Child's best interest to terminate Father's parental rights. Upon our careful review of the entire record, we agree.

Father has not raised on appeal the issue of whether termination of his parental rights was in the Child's best interest, and Father offers no argument against the trial court's finding in this regard. Mother and Stepfather, as well as the GAL, have properly raised the issue because having found a ground for termination of parental rights, a trial court is required to

-16-

consider, as we must on review, whether termination of those rights is in the child's best interest.  *See* Tenn. Code Ann. § 36-1-113(i); *In re Audrey S.*, 182 S.W.3d at 877.

As considered by the trial court, three of the nine factors contained in Tennessee Code Annotated § 36-1-113(i) apply to the case at bar:  (3) lack of regular visitation or contact, (4) lack of meaningful relationship with the Child, and (9) lack of financial support.  All three of these factors weigh heavily against maintaining Father's parental rights.  The trial court found that almost ten years had lapsed since Father had seen the Child.  Not only had Father not maintained regular visitation or contact with the Child, he had made no contact.  As a result of Father's failure to visit for nearly a decade, there could be no meaningful relationship between Father and the Child.  The trial court found that Stepfather was the only father the Child had ever known and that the Child was flourishing in Mother's and Stepfather's care.  Finally, the trial court found that Father had failed to pay support at any time during those ten years.  None of the statutory factors weighed against terminating Father's parental rights.  From a thorough examination of the record before us, we determine that there is clear and convincing evidence that termination of Father's parental rights was in the Child's best interest.

## VI. Conclusion

The judgment of the trial court terminating the parental rights of Father is affirmed. Costs on appeal are taxed to the appellant, Mark C.  This case is remanded to the trial court, pursuant to applicable law, for enforcement of the trial court's judgment and collection of costs assessed below.

_____
THOMAS R. FRIERSON, II, JUDGE

-17-